FILED
2018 Nov-20  PM 04:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

FILED
2018 Sep-24  AM 09:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ENGINEERED ARRESTING SYSTEMS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: **5:14-CV-00518-MHH** |
| ATECH, INC., et al., | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Engineered Arresting Systems Corporation (ESCO) claims that the defendants Atech, Inc., SCAMA AB, Philip Ahagen, and Harald Ahagen infringed on ESCO's "BAK-12" and "PORTARREST" trademarks in violation of the Lanham Act when the defendants responded to a United States Air Force solicitation for BAK-12 and PORTARREST-IV/BAK-12 mobile aircraft arresting systems. (Doc. 39, p. 17). ESCO also brings claims of false designation of origin and false advertising in violation of the Lanham Act, and common law unfair competition and trademark infringement claims. (Doc. 39, pp. 19-21). The case comes before the Court on the defendants' motion for summary judgment on ESCO's trademark infringement claims. (Docs. 103, 123). For the following reasons, the Court grants the motion.

## I.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  "'Genuine disputes [of material fact] are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). When considering a motion for summary judgment, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

"A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853,

857 (11th Cir. 2018); *see Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if the Court doubts the veracity of the evidence, the Court cannot make credibility determinations of the evidence at the summary judgment stage. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   <u>Motion to Strike</u>

ESCO presents its statement of facts mostly through the declarations of Dan Edwards (Doc. 136-35) and Alex Del Grosso (Doc. 136-36) which ESCO submitted in opposition to the defendants' motion for summary judgment. The defendants filed a motion to strike the two declarations. (Doc. 140-2). The defendants should have raised their objections in their reply brief. The Court construes the defendants' motion to strike as an objection under Rule 56(c)(2). *See Taylor v. City of Gadsden*, 958 F. Supp. 2d 1287, 1291 (N.D. Ala. 2013), *aff'd*, 767 F.3d 1124 (11th Cir. 2014) (treating motion to strike as an objection).[1]

---

[1] The defendants should have raised their objections in their reply brief. Effective December 1, 2010, motions to strike summary judgment evidence no longer are appropriate. *See* Fed. R. Civ. P. 56(c)(2) advisory committee note (2010 amendments) ("There is no need to make a separate motion to strike."); *Campbell v. Shinseki*, 546 Fed. Appx. 874, 879 (11th Cir. 2013) ("The plain meaning of [amended Rule 56(c)(2)] show[s] that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure,

Objections under Rule 56(c)(2) function like trial objections adjusted for the pretrial setting, and "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2), advisory committee note (2010 amendments). Rule 56(c)(2) enables a party to submit evidence that ultimately will be admissible at trial in an inadmissible form at the summary judgment stage. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012). A district court has broad discretion to determine at the summary judgment stage what evidence it will consider pursuant to Rule 56(c)(2). *See Green v. City of Northport*, 2014 WL 1338106, at *1 (N.D. Ala. March 31, 2014).

1.    Declaration of Dan Edwards (Doc. 136-35)

The defendants argue that Mr. Edwards lacks personal knowledge to testify about ESCO's predecessors, consumer understanding of "BAK-12," E.W. Bliss's adoption of "BAK-12," SCAMA's BC-11 arresting system, and USAF's BAK-12 drawings. (Doc. 140-2, pp. 7, 9, 12, 15, 16). The Court disagrees. Mr. Edwards is the former president of ESCO. (Doc. 136-35, p. 1, ¶ 1). ESCO designated Mr. Edwards to testify about information known or reasonably available to ESCO in the company's Rule 30(b)(6) deposition. In his declaration, Mr. Edwards stated, "I

---

rather than a separate motion to be handled preliminarily . . . ."). Pursuant to Federal Rule of Civil Procedure 56(c)(2), at the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Accordingly, objections to evidence supporting or opposing a motion for summary judgment should be made in the objecting party's responsive brief.

am competent to give this declaration based on my personal knowledge of the events and circumstances described herein, or as a result of my review of the documents and records kept by ESCO in the ordinary course of business." (Doc. 136-35, p. 1, ¶ 2). Mr. Edwards stated also, "[b]ecause of my time [] at ESCO, including but not limited to my time as President, I am knowledgeable about or had access to business records concerning the history of the PORTARREST and BAK-12 brands, ESCO's use and ownership of its trademarks, including the PORTARREST and BAK-12 marks, ESCO's advertising, marketing, and sales of all of ESCO's products, and associated internal operations, as well as ESCO's channels of trade and target consumers, and the trade generally." (Doc. 136-35, p. 2, ¶ 3). Given Mr. Edwards's role within ESCO and his own testimony, the defendants have not established that Mr. Edwards lacks personal knowledge from which he may testify.

The defendants also argue that pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure, Mr. Edwards may not testify about ESCO and its predecessors' sales. (Doc. 140-2, pp. 9-10). Under Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion . . . ." In Atech's first interrogatories, Atech asked ESCO to "[i]dentify every person, Third Party, customer, and/or potential customer to whom Plaintiff has proposed or

offered to sell or provide a good or product under the designation PORTARREST and/or BAK-12." (Doc. 136-5, p. 24). ESCO provided a list of sales from 2006 to 2015. (Doc. 136-5, pp. 47-52). The defendants argue therefore that Mr. Edwards cannot testify as to sales before 2006. (Doc. 140-2, p. 10). The Court disagrees.

The challenged statement, "ESCO has sold at least 1200 BAK-12 systems to the USAF and international users and at least 450 PORTARREST systems" (Doc. 136-35, p. 7, ¶ 21), would not be responsive to Atech's interrogatory. The statement does not identify any customer or potential customer for ESCO's products. Thus, Mr. Edwards's statement does not inject evidence that ESCO previously withheld.

Next, the defendants argue that certain statements in Mr. Edwards's declaration are contradicted or not supported by other evidence in the record. (Doc. 140-2, pp. 6-8, 11, 13-16). The defendants also argue that this Court should disregard Mr. Edwards's statement that ESCO sold arresting systems in Alabama as sham because, the defendants argue, the statement in Mr. Edward's declaration contradicts his prior deposition testimony. (Doc. 140-2, p. 11).

Generally, the Court cannot weigh evidence or determine the credibility of evidence at the summary judgment stage. Consistent with this rule, the Court rejects the defendants' challenge of Mr. Edwards's declaration as self-serving, contrary to, or uncorroborated by other evidence. *See United States v. Stein*, 881

6

F.3d 853, 854 (11th Cir. 2018) ("[A]n affidavit which satisfies Rule 56 of the Federal Rules of Civil Procedure may create an issue of material fact and preclude summary judgment even if it is self-serving and uncorroborated.").

That general rule does not apply when a party attempts to create a material factual dispute "with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). This exception to the general rule regarding credibility is sometimes called the "sham affidavit rule." *Liebman v. Metro. Life Ins. Co.*, 708 Fed. Appx. 979, 982 (11th Cir. 2017). A court must "find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1316 (11th Cir. 2007).

Mr. Edwards states in his declaration that "ESCO has sold parts for BAK-12 systems in . . . Alabama . . . [and] has also sold full BAK-12 systems in . . . Alabama, including to Maxwell Air Force Base." (Doc. 136-35, ¶ 16). During Mr. Edwards's deposition, counsel for defendants asked: "Since your involvement with ESCO, has ESCO sold PORTARREST or BAK-12s in Alabama?" (Doc. 145-1, p. 17, 61:13-15). Mr. Edwards explained:

> To my knowledge, I -- in my 11 plus years with the corporation, I do not think we've sold any of that equipment in [] Alabama. That does not necessarily include spare parts, though. But complete systems? You may find that's not a true -- that's not correct.

But, to my knowledge, in the last 11 plus years, I don't recall have a full system sale in, in the state of Alabama.

(Doc. 145-1, p. 17, 61:15-62:1).

Mr. Edwards's statement in his declaration concerning parts sales and BAK-12 systems does not directly contradict his prior deposition testimony because the question and answer were limited to ESCO's sale of PORTARREST or BAK-12s in Alabama since Mr. Edwards's involvement with ESCO. (Doc. 144, pp. 17-18; *see also* Doc. 145-1, p. 17, 61:13-62:1). Mr. Edwards's later declaration concerning ESCO's sales in Alabama contains no time restrictions. Moreover, Mr. Edwards stated both in his deposition and in his declaration that ESCO sold parts in Alabama. Therefore, Mr. Edwards's statements in his declaration and his testimony in his deposition are not inconsistent. The Court overrules this objection.

Even if the Court were to partially strike Mr. Edwards's declaration on the basis of the sham affidavit rule, the Court's substantive analysis of ESCO's trademark claims would not change. Therefore, the Court alternatively finds that this objection is moot because the challenged evidence is immaterial to the summary judgment analysis.

Finally, the defendants' hearsay objections (Doc. 140-2, pp. 7, 9, 13, 15) are vague and misplaced. None of Mr. Edwards's statements that the defendants challenge are out-of-court statements offered to prove the truth of the matter

8

asserted.

> ### 2.   The Declaration of Alex Del Grosso (Doc. 136-36)

Mr. Del Grosso is the Director of Sales and Marketing, Europe and North America, for ESCO. (Doc. 136-36, p. 1, ¶ 1). First, the defendants object to Mr. Del Grosso's statements concerning his meetings with Polish Air Force (PAF) officials (Doc. 136-36, pp. 3-5, ¶¶ 6-7, 9-10) on the grounds that the statements are inadmissible hearsay. (Doc. 140-2, pp. 19-20). But as ESCO points out, Mr. Del Grosso's testimony about his meetings with PAF is not hearsay because ESCO does not offer the testimony for the truth of the matter asserted. (Doc. 144, pp. 16-18). Rather, ESCO offers the testimony to demonstrate that Mr. Del Grosso met with PAF and that Mr. Del Grosso thought that PAF wanted the BAK-12 and PORTARREST systems from ESCO. (*See* Doc. 144, pp. 16-17). Moreover, ESCO does not offer Mr. Del Grosso's statement that Captain Farkas showed Mr. Del Grosso a sole source letter for the truth of the matter asserted in the letter. (Doc. 144, p. 17). Rather, ESCO offers the statement to show that Mr. Del Grosso thought that PAF considered ESCO to be the only source of the BAK-12 and PORTARREST systems. (Doc. 144, p. 17).

Second, the defendants object to Mr. Del Grosso's statement that ESCO manufactured and provided BAK-12 and PORTARREST systems to PAF through third parties Maxer and Zeus, Inc. (Doc. 136-36, pp. 2-3, ¶ 5) because ESCO did

not provide this information in response to Atech's interrogatories. (Doc. 140-2, pp. 22-23). But this information would not be responsive to Atech's interrogatories because Mr. Del Grosso did not state that Maxer and Zeus, Inc. "sold, advertised, offered for sale, and/or proposed to sell or provide any . . . PORTARREST and/or BAK-12, . . . ." (Doc. 103-6, pp. 22-23). Thus, Mr. Del Grosso's statement does not inject evidence that ESCO previously withheld.

Next, the defendants object to Mr. Del Grosso's identifications of proprietary ESCO part numbers (Doc. 136-36, p. 5, ¶ 12) because Mr. Edwards did not identify the part numbers in ESCO's Rule 30(b)(6) deposition, the part numbers are irrelevant, and Mr. Del Grosso's testimony appears to be false. (Doc. 140-2, pp. 24-25). Even though Mr. Edwards did not know about ESCO's part numbers, Mr. Del Grosso may testify from his personal knowledge about the part numbers. The testimony is relevant because if part numbers in the amendment to the solicitation were proprietary to ESCO, then it is more likely that the solicitation sought ESCO products. The defendants cannot object to testimony because they believe it is false, and the Court cannot assess credibility or weigh evidence at the summary judgment stage.

Finally, the defendants' objection to Mr. Del Grosso's statement that he has "been employed by ESCO since 1984" (Doc. 136-36, p. 2, ¶ 3) on the grounds that ESCO has existed only since 1999 (Doc. 140-2, p. 25) fails because the Court

cannot assess credibility or weigh evidence, and Mr. Del Grosso likely refers to ESCO's predecessors. The defendants' objections to Mr. Del Grosso's statements about his understanding of "BAK-12" (Doc. 136-36, pp. 6-7, ¶¶ 19, 22-23) on the grounds that the testimony is irrelevant and self-serving (Doc. 140-2, pp. 25-26) fail because the testimony is clearly relevant, and ESCO may support its opposition to the motion for summary judgment with a self-serving affidavit. *See Stein*, 881 F.3d at 857.

For the foregoing reasons, the Court overrules the defendants' objections and denies the motion to strike. Therefore, ESCO's statement of facts is properly before the Court, and the Court will proceed by presenting the facts in the light most favorable to ESCO.

**B.    BAK-12 and PORTARREST Aircraft Arresting Systems**

This case concerns a USAF procurement of aircraft arresting systems for the Polish Air Force (PAF). An aircraft arresting system is a mechanical system used to rapidly decelerate aircraft as they land. (Doc. 136-35, p. 2, ¶ 5). An aircraft arresting system absorbs the forward momentum of aircraft landings in small spaces or emergencies to prevent the aircraft from overrunning the landing zone. (Doc. 136-35, pp. 2-3, ¶ 5).

An aircraft arresting system consists of an energy absorber and an engagement system. (Doc. 136-35, p. 4, ¶¶ 10-11). An energy absorber is a

11

friction brake, rotary hydraulic brake, or textile brake. (Doc. 136-35, p. 4, ¶ 10). The engagement system connects the landing aircraft to the energy absorber. (Doc. 136-35, p. 4, ¶ 11). An engagement system may consist of a net (also known as a barrier), cable, or engineered materials. (Doc. 136-35, p. 4, ¶ 11). The landing aircraft makes contact with the engagement system and the energy absorber dissipates the kinetic energy of the aircraft. (Doc. 136-35, p. 4, ¶¶ 10-11).

ESCO is the world leader in the design and manufacturing of military aircraft arresting systems. (Doc. 136-35, p. 3, ¶ 6). The BAK-12 aircraft arresting system is one of ESCO's main products. (Doc. 136-35, p. 3, ¶ 7). The BAK-12 system is a mechanical rotary friction brake that employs a cable hook system to decelerate a landing aircraft. (Doc. 136-35, p. 4, ¶ 13). "BAK" is an acronym for "barrier arresting kit," but the BAK-12 is not actually a barrier system or a barrier arresting kit because the BAK-12 is not a net system. (Doc. 136-35, p. 4, ¶¶ 12-13). However, the BAK-12 can be used in connection with a net system if needed. (Doc. 136-35, p. 4, ¶ 13; Doc. 136-36, p. 7, ¶ 21). "BAK" is pronounced "back." (Doc. 136-35, p. 6, ¶ 19) (*see* Doc. 103-13, p. 2). According to ESCO, "[t]he generic designation for the aircraft arresting system ESCO sells under its BAK-12 mark is 'friction brake' or 'rotary friction brake.'" (Doc. 136-35, p. 5, ¶ 14).[2]

E.W. Bliss Co., ESCO's predecessor, developed the original version of the

---

[2] The defendants argue that there is no more generic descriptor for the BAK-12 system than "BAK-12." (*See* Doc. 107, pp. 14-19, 23).

BAK-12 in the early 1960s pursuant to a contract with USAF. (Doc. 136-35, p. 3, ¶ 9). ESCO and its predecessors have sold the BAK-12 system since 1963 and have continuously used the "BAK-12" name. (Doc. 136-35, p. 3, ¶ 8). Until the defendants' alleged infringing use of the term, ESCO and its predecessors in interest have been the only entities to produce and sell aircraft arresting systems called "BAK-12." (Doc. 136-35, pp. 3, 7-8, ¶¶ 8, 23, 25).

For the past few decades, ESCO, not USAF, has "controlled, updated, and revised the drawing package" for the BAK-12 system. (Doc. 136-35, p. 6, ¶ 18). According to ESCO, USAF does not have a complete and updated set of drawings for ESCO's BAK-12 system. (Doc. 136-35, p. 6, ¶ 18). The current BAK-12 system that ESCO sells shares few, if any, parts in common with the original BAK-12 system commissioned by USAF in the 1960s. (Doc. 136-35, p. 6, ¶ 18).

ESCO sells other aircraft arresting systems under other trademarks. (Doc. 136-35, p. 5, ¶ 15). ESCO's PORTARREST system is comprised of a mobile friction brake. (Doc. 136-35, p. 5, ¶ 15). ESCO owns a federal trademark registration for "PORTARREST" for "self-contained, mobile, ground-based aircraft arresting system comprised of friction brakes, sheaves, and tape, contained in a transportable trailer body . . . ." (Doc. 39-1, p. 2).

As of September 2016, over 6,000 of ESCO's arresting systems were installed in 86 countries. (Doc. 136-35, pp. 2-3, ¶¶ 3, 6). In the last decade, ESCO

spent more than ███████ in marketing, advertising, and promoting its aircraft arresting systems. (Doc. 136-35, pp. 6-7, ¶ 19). ESCO markets its systems through the internet, trade shows, air shows, symposiums, industry magazines, brochures, press releases, and trade presentations. (Doc. 136-35, p. 7, ¶ 19). ESCO and the defendants market their aircraft arresting systems through the same media channels. (Doc. 136-36, p. 5, ¶ 13). An ESCO marketing feeder indicates that ESCO marketed its systems in more than 20 countries in March 2014. (Doc. 136-36, pp. 9-13). In the last decade, ESCO sold ███████ worth of BAK-12 systems and ███████ worth of PORTARREST systems. (Doc. 136-35, p. 7, ¶ 20). ESCO has sold at least 1200 BAK-12 systems and 450 PORTARREST systems to USAF and international users. (Doc. 136-35, p. 7, ¶ 21). USAF, PAF, and other military forces around the world use ESCO's BAK-12 and PORTARREST systems. (Doc. 136-35, pp. 7-8, ¶ 23).

C.    **The USAF Solicitation**

On October 23, 2012, USAF issued a solicitation to procure for PAF "two (2) BAK-12 Above Grade Fixed Hook Cable Systems" and "one (1) PORTARREST-IV/BAK-12 'Mobile' Hook Cable System." (Doc. 39-2, pp. 4-5). At the time of the solicitation, ESCO was the only manufacturer of the BAK-12 (Doc. 136-7, p. 37) and ten of ESCO's BAK-12 systems were installed across five different PAF bases (Doc. 136-36, p. 2, ¶ 5).

Pursuant to 48 C.F.R. § 6.302-1(c), USAF must justify "[a]n acquisition or portion of an acquisition that uses a brand-name description or other purchase description to specify a particular brand-name, product, or feature of a product, peculiar to one manufacturer." 48 C.F.R. § 6.302-1(c). Accordingly, USAF issued a "Brand Name Justification" accompanying the solicitation which stated, "[t]he requirement includes: Two (2) BAK 12 Above Grade Fixed Hook Cable Systems, One (1) Portarrest IV/BAK-12 Mobile Aircraft Arresting System, . . . . This brand name is required because the Polish government specifically requested the BAK-12 Aircraft Arresting System . . . . It is therefore in the best interests of the Government to limit offers to procure the BAK-12 only." (Doc. 39-3, p. 3). The Brand Name Justification stated also that "[t]he manufacturer and several other sources distribute this product," and "[m]ultiple vendors carry this equipment." (Doc. 39-3, p. 3). The Brand Name Justification listed ESCO, SCAMA, SEI Manufacturing, Inc., Ballantine Aviation Consulting Services, and DCM Support Services, Inc. as "vendors that have expressed interest in this acquisition, or that are capable of fulfilling the requirements." (Doc. 39-3, p. 4).

ESCO and the defendants each submitted a proposal to USAF in response to the solicitation. (Doc. 103-4, p. 34).[3] USAF amended the solicitation three times,

---

[3] Atech and SCAMA submitted a joint bid together with D'Salient Technologies and DCM Support Services. (*See* Doc. 136-8, pp. 15-16; Doc. 136-11, p. 2; Doc. 136-20, pp. 2-4).

and the defendants responded to each amendment. (*See* Doc. 136-11, -13, -20).
USAF awarded the contract to the defendants on May 21, 2013. (Doc. 136-33, p.
2).

According to ESCO, the solicitation sought only ESCO's products and PAF
wanted only ESCO's products. In early 2009, Mr. Del Grosso began having
meetings with PAF representatives about providing PAF ESCO's BAK-12 and
PORTARREST systems. (Doc. 136-36, p. 3, ¶ 6). According to Mr. Del Grosso,
PAF wanted more of ESCO's systems because ESCO systems were already in
place in Poland. (Doc. 136-36, p. 3, ¶ 6). According to Mr. Del Grosso, Captain
Farkas, the Assistant Air Attaché for Poland, showed Mr. Del Grosso a "sole
source" letter that authorized BAE Systems, a third-party vendor, to procure
ESCO's systems for Poland. (Doc. 136-36, p. 4, ¶ 10). Mr. Del Grosso believed,
based on his interactions with PAF representatives, that PAF wanted ESCO's
BAK-12 and PORTARREST systems before, during, and after the solicitation, and
that PAF thought it would receive ESCO's systems. (Doc. 136-36, pp. 3-4, ¶¶ 7,
9).

Mr. Del Grosso reviewed the first amendment to the solicitation and
determined that parts required by the solicitation consisted largely of ESCO parts
identified with ESCO part numbers. (Doc. 136-36, p. 5, ¶ 12). According to Mr.
Del Grosso, over ninety of the required parts listed in the amendment were

proprietary to ESCO. (Doc. 136-36, p. 5, ¶ 12).

ESCO brought suit against the defendants on March 21, 2014 (Doc. 1) and amended its complaint on May 15, 2014 (Doc. 39).[4] In the amended complaint, ESCO brings claims for registered trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and common law unfair competition and trademark infringement. (Doc. 39, pp. 17-21). The Court instructed the parties to limit discovery and summary judgment briefing to ESCO's trademark infringement claims to test the underlying merits of ESCO's claims, namely whether "BAK-12" is a valid mark and whether the defendants used "PORTARREST." (*See* Doc. 123; Doc. 125, pp. 19, 25, 31; Doc. 126, pp. 5, 11).

On December 31, 2015, the defendants filed a motion for summary judgment in which they argue that there is no genuine issue of material fact as to either of those two fundamental questions. (Doc. 103). On May 10, 2017, following a prolonged discovery dispute that remains unresolved, ESCO responded in opposition to the motion for summary judgment. (Doc. 136). ESCO argues that summary judgment is inappropriate because a reasonable jury could find that

---

[4] ESCO brought suit initially against other defendants who have since been dismissed. (*See* Docs. 72, 85, 114).

ESCO owns a valid mark in "BAK-12," that the defendants' use of "BAK-12" is likely to cause confusion, and that the defendants used "PORTARREST." The discovery dispute and the issues in the defendants' motion for summary judgment are ripe for resolution.

## III.   ANALYSIS

### A.   The Court Will Not Defer Consideration of the Motion for Summary Judgment.

In conjunction with ESCO's opposition to the defendants' motion for summary judgment, Jennifer Fairbairn Deal, counsel for ESCO, filed a Rule 56(d) declaration in which Ms. Deal asks the Court to deny or defer consideration of the motion for summary judgment until ESCO obtains additional discovery. (Doc. 132, p. 2, ¶ 2); *see* Fed. R. Civ. P. 56(d)(1) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it . . . .").

As the Court acknowledged in its April 5, 2016 text order, ESCO has argued repeatedly that purported discovery deficiencies impact the company's ability to respond to the defendants' motion for summary judgment, "specifically, the defendants' refusal to produce internal documents, the defendants' refusal to produce documents unrelated to the Polish Air Force solicitation or contract at issue, and the narrow time frame from which the defendants are willing to produce documents." (Doc. 109). ESCO's main contention is that the defendants limited

18

the scope of their responses to materials concerning the PAF procurement, but according to ESCO, the company's claims of infringement go beyond the procurement. (*See* Doc. 39, p. 17, ¶ 53; Doc. 125, pp. 12-13, 20; Doc. 132, pp. 8-9, ¶ 20-22). In response, the defendants have routinely contended that requests for documents unrelated to the solicitation are overly broad, outside the scope of ESCO's claims, and calculated to obtain business intelligence on SCAMA. (*See* Doc. 125, p. 11; Doc. 132-5, p. 4; Doc. 140-4, pp. 7-12). The Court has attempted to help the parties resolve the dispute by holding three telephone conferences (*see* Docs. 125, 126, 132-10), but the dispute remains unresolved.

Amended Rule 26 of the Federal Rules of Civil Procedure defines the scope of discovery as "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, . . . ." Fed. R. Civ. P. 26(b)(1). As the Supreme Court has held, "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).

"Before entering summary judgment the district court must ensure that the parties have an adequate opportunity for discovery." *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1316 (11th Cir. 1990). For the district court to grant a nonmoving party's Rule 56(d) request to defer consideration of a motion for summary judgment, the nonmoving party "must show that 'postponement of a

ruling on the motion will enable [her], by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" *Smedley v. Deutsche Bank Tr. Co. Americas*, 676 Fed. Appx. 860, 862 (11th Cir. 2017) (quoting *Fla. Power*, 893 F.2d at 1316) (alteration in original).

Here, the issues challenged in the defendants' motion for summary judgment -- whether "BAK-12" is a protectable mark in the first place and whether the defendants used "PORTARREST" -- are threshold matters for ESCO's trademark infringement claims. More than enough discovery has been conducted for ESCO to respond to the defendants' motion for summary judgment on these fundamental questions.

The defendants provided ESCO extensive discovery concerning the USAF procurement. ESCO has all of the defendants' proposal documents, all of the defendants' pre-award communications with USAF, all of the defendants' pre-award communications between the various individuals who worked on the proposal, and communications among USAF personnel. (*See, e.g.,* Docs. 136-4, -9, -10-13, -15-22, -28, -30, -32). ESCO took the 30(b)(6) depositions of SCAMA (Doc. 136-8) and Atech (Doc. 136-14). ESCO took the depositions of USAF Aircraft Arresting System Engineer Christopher Peisher (Doc. 136-7) and USAF Contracting Officer Jeffery Smith (Doc. 136-23). The defendants entered official USAF documents and commercial publications into the record. (*See* Docs. 103-5,

-7, -12, -14-18, -20).  These are the types of discovery materials that ESCO needs to demonstrate a non-generic use of "BAK-12" and an infringing use of "PORTARREST."

Yet ESCO contends that it needs more discovery to respond to the motion for summary judgment.  ESCO argues that it needs three categories of information from the defendants:  information concerning the primary significance of "BAK-12"; information concerning the defendants' use of "PORTARREST"; and information relevant to whether the defendants' use of "BAK-12" and "PORTARREST" is likely to cause confusion. (Doc. 132-1, p. 2).

ESCO does not need more discovery from the defendants concerning the primary significance of "BAK-12" to respond to the motion for summary judgment.  As discussed, the defendants have provided a substantial amount of evidence concerning the primary significance of "BAK-12" in the minds of the defendants, USAF, and the public.  Moreover, as ESCO states, thousands of ESCO's systems are installed in 86 countries, ESCO has spent ████████████ in marketing BAK-12 systems, ESCO sold ██████████ worth of BAK-12 systems in the last decade, and ESCO has sold at least 1200 BAK-12 systems. (Doc. 136-35, pp. 3, 6-7, ¶¶ 6, 19-21).  Given ESCO's global reach and dominance in the aircraft arresting systems industry, ESCO is more likely than any other entity to have evidence of a non-generic use of "BAK-12" and evidence concerning the

significance of "BAK-12" in the minds of consumers, suppliers, international militaries, or competitors. In the time since the defendants filed their motion for summary judgment, ESCO has had an adequate opportunity to discover and present any such evidence in addition to the substantial evidence in the record.

The defendants have provided to ESCO materials that ESCO contends demonstrate the defendants' multiple uses of "PORTARREST." (*See* Doc. 136, pp. 26-27) (citing Docs. 136-5, -11-13, -20, -28, -34, -36). The Court is not persuaded by ESCO's vague assertion that this evidence "is at least enough to suggest that other documents showing Defendants used the PORTARREST mark exist." (Doc. 132, p. 42, ¶ 71).

Moreover, ESCO had the opportunity at SCAMA's or Atech's deposition to ask whether either company used "PORTARREST;" ESCO chose not to do so. ESCO's counsel never mentioned PORTARREST at Atech's deposition. At SCAMA's deposition, ESCO's counsel asked SCAMA's representative one question about PORTARREST: "[a]nd at the time the solicitation issued, turning to the next line, did SCAMA have in its possession a PORTARREST IV/BAK-12 maintenance manual?" to which the representative responded, "PORTARREST, I don't know what it is. BAK-12 maintenance manual I suppose we had." (Doc. 136-8, p. 47).

Notwithstanding ESCO's argument to the contrary (Doc. 132, pp. 35-36, ¶

58), SCAMA's counsel did not foreclose ESCO's counsel from asking about uses of "PORTARREST." At the deposition, ESCO's counsel asked, "[y]ou said SCAMA has submitted proposals related to BAK-12 or MAAS systems beyond the contract, the USAF contract. Do you recall what those proposals were for?" (Doc. 136-8, p. 26). SCAMA's counsel then objected to questions "about specific work that they're doing outside this contract[.]" (Doc. 136-8, p. 26). SCAMA's counsel then stated that he believed that the Court limited the scope of discovery to the USAF procurement and offered to review the telephonic conference transcripts with ESCO's counsel. (Doc. 136-8, p. 27). ESCO's counsel responded, "[t]hat's fine. I can move on for now." (Doc. 136-8, p. 27). SCAMA's attorney's objection did not prevent ESCO's attorney from asking plainly whether SCAMA used "PORTARREST." Given the evidence already in the record and the adequate opportunity ESCO already has had to discover whether the defendants used "PORTARREST," there is no need to delay Rule 56 proceedings regarding the defendants' use of "PORTARREST."

Not only has ESCO had an adequate opportunity for discovery concerning likelihood of confusion, for the reasons discussed in the next section of this memorandum opinion, ESCO has not raised an issue of fact as to whether ESCO has any rights to "BAK-12" or whether the defendants used "PORTARREST." A likelihood of confusion analysis is necessary only if the plaintiff owns a valid mark

in the first place and the defendant actually used the mark. Thus, no more discovery is needed on the issue of confusion.

Expanding discovery to materials beyond the procurement and to third parties would cause unnecessary delay and not be proportional to the needs of ESCO's case. There is enough evidence in the record for ESCO to show a genuine dispute as to the validity of its "BAK-12" mark and the defendants' use of "PORTARREST," if such issues of fact exist. Accordingly, the Court denies ESCO's Rule 56(d) request to defer consideration of the motion for summary judgment.

B.   **"BAK-12" is Generic as a Matter of Law.**

To survive the defendants' motion for summary judgment on ESCO's trademark infringement claims, ESCO must raise a genuine issue as to whether ESCO owns a valid trademark in "BAK-12" and, if so, whether the defendants' use of "BAK-12" is likely to cause confusion. *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1131 (11th Cir. 2018) (citing *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010)).

ESCO has not registered "BAK-12" as a trademark, but a plaintiff "need not have a registered trademark to use and enforce that mark." *Commodores Entm't Corp.*, 879 F.3d at 1131. Rather, a plaintiff owns a common law trademark if the mark is "so associated with its goods that the use of the same or similar marks by

24

another company constitutes a false representation that its goods came from the same source." *Tana*, 611 F.3d at 773 (internal quotation marks omitted). Common law trademark protection "is only available to 'distinctive' marks." *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). For a mark to be distinctive, it must be "capable of distinguishing the owner's goods from those of others." *Tana*, 611 F.3d at 773 (citing *Two Pesos*, 505 U.S. at 768).

The Eleventh Circuit recognizes four categories of distinctiveness -- arbitrary or fanciful, suggestive, descriptive, and generic. *Tana*, 611 F.3d at 774 (citing *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797 (11th Cir. 2003)). Arbitrary or fanciful marks "bear no relationship to the product" and are inherently distinctive. *Gift of Learning*, 329 F.3d at 798. Suggestive marks "suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive" and are inherently distinctive. *Id.* Descriptive marks identify a characteristic or quality of a product or service and are not protectable unless the marks "acquire distinctiveness or 'secondary meaning' by becoming associated with the proprietor's product or service." *Welding Servs.*, 509 F.3d at 1358 (quoting *Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1548 (11th Cir. 1987)).

25

Generic terms "suggest the basic nature of the product or service." *Gift of Learning*, 329 F.3d at 797. The Eleventh Circuit has explained that "[t]here are several different approaches to defining 'generic'":

> By one test, a generic name refers to "a particular genus or class of which an individual article or service is but a member." *Soweco[, Inc. v. Shell Oil Co.]*, 617 F.2d [1178,] 1183 [(5th Cir. 1980)] (internal quotation marks omitted). By another measure, a generic name is the term by which the product or service itself is commonly known. *See Nat'l Conference of Bar Exam'rs v. Multistate Legal Studies*, 692 F.2d 478, 487 (7th Cir. 1982). Still other courts say a generic name depicts the product or service as a whole, rather than any particular feature, quality, or characteristic of the whole. *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1039 (D.C. Cir. 1989) (citing *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983)). Genericness lies not in the term itself, but in the use of the term: "A word may be generic of some things and not of others: 'ivory' is generic of elephant tusks but arbitrary as applied to soap." *Soweco*, 617 F.2d at 1183.

*Welding Servs.*, 509 F.3d at 1358.

Generic terms "are generally incapable of receiving trademark protection." *Tana*, 611 F.3d at 774; *see Welding Servs.*, 509 F.3d at 1358 ("A generic use of a word may not be registered as a trademark."). Even if the public associates the goods with a particular source, generic terms for goods cannot receive trademark protection. *See Welding Servs.*, 509 F.3d at 1358 ("Courts have generally held that a term used generically cannot be appropriated from the public domain; therefore, even if the name becomes in some degree associated with the source, a generic mark cannot achieve true secondary meaning."). Accordingly, evidence of

26

secondary meaning and confusion is irrelevant unless the mark is non-generic in the first place. *See Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1321 (11th Cir. 2012); *Welding Servs.*, 509 F.3d at 1358 ("[S]econdary meaning [is] not relevant to generic mark[.]") (citing *Soweco*, 617 F.2d at 1185 n. 20); *Gift of Learning*, 329 F.3d at 801 ("[C]onfusion . . . is irrelevant unless the mark is protectible in the first instance.").

The defendants argue that there is no genuine dispute that "BAK-12" is "a generic military designation for a standard type of USAF arresting system" and thus not a trademark. (Doc. 107, p. 1). The Court agrees.

The defendants offered evidence of multiple uses of "BAK-12" as the generic designation of the standard USAF aircraft arresting system comprised of a rotary friction brake and a cable hook system. ESCO does not dispute that USAF coined the term "BAK-12" in the early 1960s. Mr. Edwards admitted that "BAK-12" "is an air force term." (Doc. 103-B, p. 79). Mr. Edwards admitted that "-12" is a sequential number for the BAK series. (Doc. 103-B, p. 79). The BAK series consists of at least BAK-6, BAK-9, BAK-11, BAK-12, BAK-13, BAK-14, and BAK-15. (*See* Doc. 103-14, pp. 6-10; Doc. 103-15, pp. 38-51; Doc. 103-19, p. 9; Doc. 136-36, p. 6, ¶ 18). There are different types of BAK-12 systems, including a "BAK-12 60-Inch Reel," "BAK-12 66-Inch Reel," and "Dual BAK-12 66-Inch Reel." (Doc. 103-15, p. 38).

27

ESCO contends that it "uses the BAK-12 mark in the same manner as it uses its other trademarks, including the PORTARREST mark." (Doc. 136, p. 19). The record shows instead that ESCO itself has used BAK-12 generically and differently than other (uncontested) marks. Materials on ESCO's website state that "[t]he ESCO BAK-12" is the "standard emergency aircraft arresting system" used by USAF. (Doc. 103-8, p. 2; Doc. 103-12, p. 7). In its own publications, ESCO has used the "®" symbol with "PORTARREST" and "SMARTARREST" (Doc. 103-12, pp. 5, 8), and the "™" symbol with "WaterTwister," "Mobilnet," and "Universal Safety Response" (Doc. 103-13, pp. 10, 12), but ESCO never has used a trademark symbol with "BAK-12" or any BAK system in those publications. (*See* Doc. 103-12, pp. 6-7; Doc. 103-13, p. 10). A slide in an ESCO internal marketing presentation refers separately to the "USAF/Atech BAK-12" and the "ESCO-BAK-12(X)." (Doc. 103-X, p. 24). A publication from one of ESCO's predecessors states that "[t]he BAK-12 is the U.S. Air Force standard emergency arresting system conforming to Specification MIL-A-38202." (Doc. 103-7, p. 2).

Any manufacturer can produce a BAK-12 according to USAF's drawing package of technical specifications for the BAK-12. (Doc. 103-5; *see* Doc. 136-32, pp. 3-4). In 1972, USAF issued Military Specification, MIL-A-38202C, titled "AIRCRAFT ARRESTING SYSTEM BAK-12A/E32A; PORTABLE, ROTARY FRICTION." (Doc. 103-5, p. 2). MIL-A-38202C "covers the following

emergency types of portable, rotary friction, aircraft arresting systems: BAK-12A/E32A – Single absorber, 1,200 foot runout[;] BAK-12A/E32A – Dual absorber, 1,200 foot runout." (Doc. 103-5, p. 2).

Numerous USAF documents use BAK-12 generically. A USAF document titled "Air Traffic Control Training Series – Equipment – Arresting Systems" (Doc. 103-14, p. 6), Air Force Instruction 32-1043, "Managing, Operating, and Maintaining Aircraft Arresting Systems" (Doc. 103-15, p. 44), and a USAF technical report titled "Category II A-7D/Arresting Systems Compatibility Tests" (Doc. 103-16, p. 15) refer to the BAK-12 as the standard USAF aircraft arresting system. Air Force Handbook 10-222, "Guide to Mobile Aircraft Arresting System Installation," describes the BAK-12 as a component of a generic mobile aircraft arresting system: "[t]he MAAS is a pair of mobile units, each unit consisting of a BAK-12 arresting barrier mounted on a mobile trailer." (Doc. 103-18, p. 11). A Federal Aviation Administration "Advisory Circular" document also describes the BAK-12 as the standard USAF aircraft arresting system. (Doc. 103-17, p. 7). In addition, a Boeing publication lists "BAK" as a common term and a "U.S. designation for a barrier arresting system." (Doc. 103-20, p. 5).

Christopher Peisher, a USAF Aircraft Arresting System Engineer, stated that "[t]he USAF considers the term 'BAK-12' to be the USAF's equipment designation for an aircraft arresting system that complies with the military standard

29

for such systems." (Doc. 103-2, p. 3, ¶ 3). Mr. Peisher testified that if a manufacturer provided USAF a system according to the technical data package that USAF has for the BAK-12 system, he would call such system a "BAK-12." (Doc. 136-7, pp. 183-84). When Mr. Peisher was asked, "[c]ould you think of a more generic name for a Barrier Arresting Kit Version 12 than Barrier Arresting Kit Version 12," Mr. Peisher responded, "[t]he only thing I could say that would be more generic would be BAK-12." (Doc. 136-7, p. 202).

In response, ESCO contends that "[t]he documents cited by Defendants reflect numerous instances where BAK-12 is arguably used in a non-generic way. For example, BAK-12 is not used alone or as a noun. If BAK-12 were generic, these documents would not need to use these additional terms with BAK-12—they would be redundant." (Doc. 136, p. 23). However, assuming as ESCO contends that the generic term for "BAK-12" is "friction brake," only one exhibit that ESCO cites -- one of ESCO's own documents -- uses redundant terminology (*see* Doc. 103-I, p. 4) ("BAK-12 Friction Brakes"), and the same document refers to the BAK-12 as the "USAF & NATO Standard Arresting System" (Doc. 103-I, p. 4). The other exhibits use "BAK-12 Aircraft Arresting System," "BAK-12 Arresting System," or "BAK-12 System," and ESCO does not argue that "aircraft arresting system," "arresting system," or "system" is a more generic descriptor for the BAK-12 system.

ESCO argues also that many of the documents cited by the defendants "have glossaries, abbreviation and acronym pages, or term definition pages that do not include BAK or BAK-12; if the term were generic, one would expect it to uniformly be included on those pages." (Doc. 136, p. 23). But ESCO does not explain how a generic term would necessarily appear in a glossary within USAF documents and commercial publications.

ESCO relies on numerous communications between USAF personnel, but none raises a genuine question of material fact regarding the generic nature of the term "BAK-12." On October 11, 2011, Shonda Allen, a USAF Contract Negotiator, sent an email to procurement officers in which she stated, "[a]fter Shelley reviewed the SASS, she had a few comments. (1) Considering BAK-12 is a brand name specific to ESCO, it is determined sole source . . . . We had discussed there is only one manufacturer of this item." (Doc. 136-27, p. 3). Jeffery Smith, the USAF Contracting Officer responsible for the solicitation, testified that as of October 11, 2011, he thought "BAK-12" was "a brand name specific to ESCO" because of prior contracts with ESCO for the BAK-12. (Doc. 136-23, p. 82). On August 24, 2012, Susan Beam, the Command Country Manager acting as Program Manager for Poland (Doc. 136-23, pp. 24-26), sent an email to amend Poland's purchase request in which she stated, "we thought they (ESCO) [were] the only source." (Doc. 136-4, p. 2).

31

On February 11, 2013, Farah N. Keller, a USAF Contract Negotiator, emailed Dr. Ronald Schumann, a USAF attorney, to ask whether USAF could award the BAK-12 contract to the defendants despite a proposal from ESCO pointing out that ESCO is the only manufacturer of the BAK-12. (Doc. 136-30, p. 2). Dr. Schumann then held a meeting to discuss his concerns with the procurement. (Doc. 136-23 p. 133; Doc. 136-31, p. 2).

Viewing this evidence in the light most favorable to ESCO, USAF thought initially that ESCO was the only manufacturer of the BAK-12. Indeed, no company other than ESCO and its predecessors has provided USAF with BAK-12s. But that does not make the "BAK-12" term less generic. Evidence of the perceived exclusive source of the product -- i.e., evidence of secondary meaning -- is relevant only if "BAK-12" is non-generic in the first place. *See Miller's Ale House*, 702 F.3d at 1321 (11th Cir. 2012) ("The prominent use of a generic term by two competitors may understandably confuse consumers; however, this does not make the term any less generic."); *Welding Servs.*, 509 F.3d at 1358 ("[E]ven if the name becomes in some degree associated with the source, a generic mark cannot achieve true secondary meaning. . . . 'Most courts hold that a generic term is incapable of achieving trade name protection'; courts refuse to allow proof of secondary meaning to elevate generic term to trademark status.") (quoting *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 115 & n. 11 (5th Cir. 1979)); *Soweco*, 617 F.2d

at 1185 n. 20 ("Trademarks that have become generic are subject to cancellation even if they have acquired secondary meaning."); *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 647 F. Supp. 2d 1321, 1329 (M.D. Fla. 2009), *aff'd*, 654 F.3d 1179 (11th Cir. 2011) ("Generally, a generic term is afforded no trademark protection because it is not distinctive and cannot acquire secondary meaning.") (citing *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1522 (11th Cir. 1991)).   The record demonstrates that ESCO and its predecessors manufactured generically-termed arresting systems for decades with little to no competition.  The record does not, as ESCO contends, raise a dispute that "BAK-12" is a generic USAF term.

ESCO argues that a February 25, 2013 memo written by Ms. Keller shows that "BAK-12" is not generic. (Doc. 136, p. 24; Doc. 136-32, pp. 3-4).  The memo demonstrates the opposite.  In the memo, Ms. Keller stated,

> [d]uring our research we found that "BAK-12" is a generic USAF term for the aircraft arresting gear system (AAS).  It is not associated with [or] particular to a certain manufacture[r].  According to AFI32-1043, the BAK-12 is the standard USAF operational AAS.  We also spoke with our subject matter expert Christopher Peisher at Robins AFB. . . .  He let us know that the USAF owns a drawing package for the BAK-12 that is current and up to date.  The ESCO drawing package is specific to the ESCO BAK-12 system.  Mr. Peisher indicated that anyone can obtain the USAF drawing package and build the BAK-12, including ATECH . . . ."

(Doc. 136-32, pp. 3-4).  ESCO argues that "[a]t best, [the memo] shows only the opinion of one or two members of a single USAF procurement team.  Further, the

'market research' on which Ms. Keller based her finding of genericness *did not involve any research into the term or designation BAK-12*—just the availability of the underlying system." (Doc. 136, p. 24) (emphasis in original). To support the latter argument, ESCO cites to Mr. Smith's deposition when Mr. Smith was asked, "[w]as there any research done about the term 'BAK-12' as opposed to the system?" to which Mr. Smith responded, "[n]ot that I'm aware of." (Doc. 136-23, p. 139).

But the memo states clearly that USAF researched the "BAK-12" term, not just the system. (Doc. 136-32, p. 3) ("During our research we found that 'BAK-12' is a generic USAF term for the aircraft arresting gear system (AAS)."). Moreover, the memo uses "BAK-12" generically multiple times. (*See* Doc. 136-32, pp. 3-4) ("'BAK-12' is a generic USAF term . . ."; "BAK-12 is the standard USAF operational AAS"; "The ESCO drawing package is specific to the ESCO BAK-12 system"). ESCO argues, "that research was needed or conducted indicates that whether BAK-12 functions as a mark is a genuine issue of material fact." (Doc. 136, p. 24). But research does not make the term less generic. A buyer's knowledge of only one supplier for a product does not, standing alone, suggest that the term used to describe the product is not generic.

In addition, ESCO argues that "[a] reasonable jury could find that the generic name for the product at issue here is a friction brake or a rotary friction

brake." (Doc. 136, p. 25); (*see* Doc. 136-35, p. 4, ¶ 14) ("The generic designation for the aircraft arresting system ESCO sells under its BAK-12 mark is 'friction brake' or 'rotary friction brake.'"); (*see also* Doc. 103-B, p. 184) (Mr. Edwards testifying that the generic term for the BAK-12 is "friction brake arresting system"). But "friction brake," "rotary friction brake," or "friction brake arresting system" is too vague to describe the BAK-12 because these terms do not capture all of the characteristics of BAK-12. (*See, e.g.,* Doc. 103-15, pp. 38, 43-44) (BAK-9); (Doc. 103-19, p. 9) (BAK-9, 500S, E15, and E27); (Doc 103-20, p. 5) (same).

As the defendants point out, ESCO's argument that "rotary friction brake" adequately and more generically describes the BAK-12 is similar to an argument the First Circuit rejected in *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701 (1st Cir. 2007). In *Colt*, the U.S. military deemed the M4 Carbine proprietary to Colt and designated Colt the sole supplier of M4's. A competing manufacturer of M4's rebutted the presumption of validity of Colt's registered "M4" trademark by demonstrating that "M4" was generic as a matter of law. *Colt*, 486 F.3d at 706-07. Colt argued that "M4" was not generic because "the words carbine, rifle, and firearm are adequate alternative descriptors of the M4." *Colt*, 486 F.3d at 710. The First Circuit rejected Colt's argument:

> This argument is misplaced. The M4 is a lightweight, gas-operated, air-cooled, magazine-fed, selective-rate-of-fire weapon with a

> collapsible stock. Colt has identified no word, other than M4, that
> captures these characteristics. The closest term Colt identifies is
> "carbine," but carbine means only a "short-barreled lightweight rifle."
> It does not capture the several characteristics that comprise an M4.

*Colt*, 486 F.3d at 710 (citations omitted).[5]

Here, there is no dispute as to the defining characteristics of the BAK-12.

The BAK-12 "is an aircraft arresting system comprised of a rotary friction brake

with a cable hook system and that can be used in connection with a net/barrier

system if needed." (Doc. 136-35, p. 4, ¶ 13). It may be installed above or below

grade, or trailer-mounted for mobility. (Doc. 103-8, p. 2). The system is

completely self-contained and will automatically operate when the landing aircraft

engages the hook cable or net barrier. (Doc. 103-8, p. 2). Aircrafts can engage the

BAK-12 system landing in either direction across the runway. (Doc. 103-8, p. 2).

Just as the First Circuit found that "carbine" did not capture the characteristics of

the M4, "rotary friction brake" does not capture the characteristics of the BAK-12.

"BAK-12" does not describe a characteristic or quality of a rotary friction brake

product. Rather, "BAK-12" describes the BAK-12 which includes among its

characteristics a friction brake.

Similarly, ESCO has not identified a genuine question of material fact as to

whether "BAK-12" and the underlying phrase "barrier arresting kit-12" are distinct

---

[5] In relying on *Colt*, the Court is not saying that a military designation never can be a protectible mark. It is the use of a mark that matters, not the identity of the entity that created the mark.

from each other.  An abbreviation of generic words can be inherently distinctive if "the abbreviation has a meaning distinct from the underlying words in the mind of the public." *Welding Servs.*, 509 F.3d at 1359.  ESCO argues that "BAK-12" could be distinct from "barrier arresting kit-12" because "the aircraft arresting system ESCO sells under the BAK-12 mark is *not* a barrier system or barrier arresting kit" because standing alone the BAK-12 employs a cable rather than a net.  (Doc. 136, pp. 9-10) (emphasis in original).  But ESCO does not explain how this relates to its distinctiveness argument -- "barrier arresting kit-12" and "BAK-12" both mean the BAK-12 system.

Finally, ESCO argues that a reasonable jury could find that "BAK-12" is a trademark based on the Brand Name Justification alone.  (Doc. 136, p. 8).  By issuing the Brand Name Justification, USAF represented implicitly that it thought that "BAK-12" was a brand name or peculiar to ESCO as the manufacturer.  *See* 48 C.F.R. § 6.302-1(c).  But USAF did not represent that it thought that "BAK-12" was not generic.  As previously discussed, a mark is not necessarily non-generic just because only one manufacturer produces goods under or continuously uses the mark.  (Doc. 136, p. 21).  Moreover, the Brand Name Justification stated clearly that USAF could obtain an arresting system from multiple sources.  (Doc. 39-3, pp. 3-4) ("The manufacturer and several other sources distribute this product"; "Multiple vendors carry this equipment and purchasing only BAK-12 equipment

will not significantly reduce competition"; "The vendors that have expressed interest in this acquisition, or that are capable of fulfilling the requirements are: ESCO Corporation, SCAMA, . . . ."). In addition, the Brand Name Justification states, "[t]his brand name is required because the Polish government specifically requested the BAK-12 Aircraft Arresting System." (Doc. 39-3, p. 3). Accordingly, the Brand Name Justification demonstrates that PAF wanted the BAK-12, which multiple sources could provide; it does not demonstrate that "BAK-12" is not generic.

Although ESCO was the only manufacturer of the BAK-12 for decades and evidence demonstrates that USAF and PAF thought as such, the term "BAK-12" is a generic USAF designation for the BAK-12 aircraft arresting system and is therefore incapable of trademark protection.

### C.   The Defendants Did Not Use "PORTARREST."

"The first step of a trademark infringement action is to demonstrate an unauthorized 'use' of the plaintiff's mark in commerce." *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1242 (11th Cir. 2007) (citing *Burger King Corp. v. Mason*, 710 F.2d 1480, 1491 (11th Cir. 1983)). The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade." 15 U.S.C. § 1127.

The defendants argue that there is no evidence that they have ever used

"PORTARREST" in a prohibited manner. (Doc. 107, p. 30). The Court agrees. Notably, ESCO did not present evidence that the defendants offered to provide a "PORTARREST" or an ESCO system, labeled any of the defendants' products as "PORTARREST," advertised the term "PORTARREST," or suggested an affiliation with "PORTARREST." In fact, in the annex to the defendants' proposal, the defendants made clear that they would provide a generic "BAK-12 mobile hook cable system MAAS" -- the defendants did not use "PORTARREST." (Doc. 136-34, pp. 2, 4). Moreover, ESCO does not dispute that the virgule "/" in the solicitation meant that USAF sought a PORTARREST-IV *or* a generic BAK-12 mobile hook cable system, (*see* Doc. 107, p. 32), and ESCO does not dispute that USAF awarded the contract to the defendants with "full knowledge that Atech would be manufacturing and supplying its own BAK-12 fixed system and BAK-12 MAAS in accordance with USAF specifications," (Doc. 103-9, pp. 4-5, ¶ 11).

But according to ESCO, the defendants used "PORTARREST" when Harold Ahagen, on behalf of SCAMA, sent an email to Ms. Allen in which Mr. Ahagen stated, "[w]e hereby submit our Capabilities Package for Solicitation FA8630-12-R-5004 sources sought for the supply of BAK-12 fixed arrester systems and mobile Portarrest with BAK-12 brakes for Poland and Morocco." (Doc. 136-28, p. 36). The Capabilities Package attached to the email stated, "SCAMA Response To USAF Solicitation FA8630-12-R-504[;] Capabilities Package[;] BAK-12 and

Portarrest IV/MAAS Production, Installation and Training Capabilities." (Doc. 136-28, p. 38). Both of these uses of "Portarrest" are references to the title of the USAF solicitation and not a "use in commerce" of "PORTARREST."

ESCO argues also that the defendants used "PORTARREST" in the annex to their proposal. (Doc. 136-34). In a table of USAF contracts in the "Past Performance" section of the annex, the defendants listed both "Portarrest IV/MAAS HPU Donut Loader" and "Portarrest IV/MAAS Tire Test" as the "Type of Contract" for two contracts. (Doc. 136-34, p. 15). Once again, these are references to the labels USAF gave to contracts and not a "use in commerce" of "PORTARREST." And just like the solicitation, the contract names separate "Portarrest" and generic designations with a virgule "/."

In addition, ESCO presents one page of SCAMA's promotional materials in which SCAMA states, "Dec 2011 AFLCMC/WFG . . . seeks qualified to prequalify OEMs for manufacturing . . . of USAF's standard BAK-12 above grade fixed hook cable systems and the USAF Standard Portarrest-IV/BAK-12 Mobile hook cable system . . . to Poland and Morocco." (Doc. 136-36, p. 16). This is not a use of "PORTARREST" for purposes of the Lanham Act; it is, instead, a literal description of the solicitation process. In the first bullet, SCAMA identifies what USAF sought, using the exact language of the solicitation, and in the second bullet, SCAMA says that USAF qualified SCAMA to perform the contract. (Doc. 136-

36, p. 16).

Finally, the defendants did not use "PORTARREST" when they responded to the solicitation, responded to the amendments, or signed the contract -- all documents that contained "PORTARREST." (*See* Doc. 136, p. 26). USAF, not the defendants, included "PORTARREST" in those documents. (*See* Doc. 39-2; Docs. 136-11, -13, -20, -33). The defendants did not suggest that they would provide a PORTARREST-IV simply by responding to these USAF documents. The solicitation sought a brand-name PORTARREST-IV or a generic mobile BAK-12 system, the defendants made clear that they would provide a generic system, and USAF understood that the defendants would provide a generic system. ESCO has not shown that the defendants ever made a "use in commerce" of the "PORTARREST" trademark for purposes of the Lanham Act. Accordingly, the defendants cannot be held liable for trademark infringement.[6]

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** the defendants' motion for summary judgment. The Court enters judgment for the defendants on ESCO's trademark infringement claims as a matter of law. By separate order, the Court will address ESCO's remaining claims.

---

[6] Because BAK-12 is a generic term, and ESCO has not shown that the defendants used PORTARREST in a manner inconsistent with the Lanham Act, the Court does not reach ESCO's argument that the defendants' use is likely to cause confusion. (Doc. 136, pp. 27-36).

**DONE** and **ORDERED** this 24th day of September, 2018.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE